[Cite as *Ghani v. Greenfield*, 2018-Ohio-3259.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Zubaidah A. Ghani, | : | |
| Plaintiff-Appellant, | : | |
| | | No. 17AP-478 |
| v. | : | (C.P.C. No. 15DR-2015) |
| Eugene Greenfield, | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |

D E C I S I O N

Rendered on August 14, 2018

**On brief:** *Derek A. Farmer*, for appellant. **Argued:** *Derek A. Farmer.*

**On brief:** *Omar Tarazi*, for appellee. **Argued:** *Omar Tarazi.*

APPEAL from the Franklin County Court of Common Pleas
Division of Domestic Relations, Juvenile Branch

BRUNNER, J.

{¶ 1} Plaintiff-appellant, Zubaidah A. Ghani, appeals two judgments of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, entered on June 8 and November 8, 2017. The June 8, 2017 entry granted the parties a divorce, ordered the sale of the marital residence, and gave the parties equal parenting time of their three children, but designated defendant-appellee, Eugene Greenfield, the legal custodian and residential parent. The November 8, 2017 entry served to enforce part of the June 8, 2017 entry by investing Greenfield with authority to execute all necessary documents for the sale and closing of the marital residence. Because the trial court acted within the reasonable exercise of its discretion in naming Greenfield the parties' children's legal custodian and residential parent and in dividing parenting time equally, we affirm the divorce decree. Because the trial court exercised reasonable discretion in giving Greenfield the power to execute the sale of the marital residence and in enforcing the intent of the

decree except in limited instances in which it modified the decree, we affirm in part and reverse in part the enforcement entry.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On May 29, 2015, Ghani filed a complaint for divorce against Greenfield and requested that she be named sole custodian and residential parent for their three children. (May 29, 2015 Compl.) Four days later, Ghani "relocated" with the children to Cleveland. (July 15, 2015 Ghani Aff. at 3.) On June 4, 2015, Greenfield answered and counterclaimed requesting a divorce and he be awarded sole custody. (June 4, 2015 Answer & Counterclaim.) In mid-July, Ghani requested not only that she be the sole custodian and residential parent but that Greenfield have only supervised visitation with the three children once per month. (July 15, 2015 Ghani Aff. at 3.)

{¶ 3} After accepting affidavits from the parties and other witnesses, on August 5, 2015, the court issued a temporary order awarding shared custody to both parents and designating Greenfield the residential parent for school placement purposes. (Aug. 5, 2015 Temporary Order at 1.) Two days after that, Ghani filed a motion requesting exclusive and beneficial use of the marital residence at 6912 Laurel Boat Lane, Canal Winchester, OH 43110. (Aug. 7, 2015 Mot. for Beneficial Use.) Three days thereafter, and more than two months after her initial departure, Ghani announced her relocation from Cleveland back to the marital residence in Canal Winchester. (Aug. 10, 2015 Relocation Notice.)

{¶ 4} In October 2015, a magistrate of the trial court held a hearing on the motion for beneficial use and also to consider amendments to the temporary order. (Oct. 16, 2015 Hearing Tr.) During the hearing, testimony was presented by both parties and Greenfield presented a video. *Id.* in passim. Greenfield testified to the effect that Ghani played loud recitations of religious literature late at night and moved her father into the marital house with her. *Id.* at 50, 54-56, 60-61. The video played during the hearing shows an incident where Ghani, while holding one of the children, repeatedly moved to block Greenfield from going into one of the children's rooms and accused him of harassing her whenever he attempted to walk past her to gain access to the room. *Id.* at 57-58; Sealed Ex. A.6. Following the hearing, on November 3, 2015, the trial court issued an amended temporary order designating Greenfield the residential parent and legal custodian for all the children, granting equal parenting time to Ghani, and granting Ghani exclusive use of the marital residence. (Nov. 3, 2015 Order at 2, 4.)

{¶ 5}    In January through April 2017, the court held a trial.  Prior to trial the parties stipulated that they were married in March 2007, and have three children, E.G. (born 2011), A.G. (born 2012), and I.G. (born 2014).  (May 6, 2016 Stipulations.)  As to contested matters, 11 witnesses testified.  Ghani testified on her own behalf and also called her father and two acquaintances to testify to her parenting abilities.  She called Greenfield's new girlfriend to testify.  She also hired a private investigator during the course of the case who attempted to testify to Greenfield's movements in an effort to speculate about whether he spent his parenting time with the children.  Greenfield testified on his own behalf and called his father and sister to testify about his parenting aptitude and the relationship they have observed between the parties.  He also hired a vocational expert to opine on Ghani's employability and earning potential.[1]  The final witness to testify was an expert called by the court, the guardian ad litem for the children.  As the issues in this appeal focus on the disposition of the marital residence post-trial and the trial court's decision to award legal custody to Greenfield, our review of the testimony will be limited as such.

{¶ 6}    Ghani testified that, with Greenfield's agreement, she left work as a teacher when the third of the three children was born on January 1, 2014.  (Tr. at 534-35.)[2]  She testified that Greenfield had three jobs and was also a member of a number of civil and social organizations.  (Tr. at 546-48.)  She alleged that he was essentially an absentee father who put all the child-rearing and household responsibilities on her.  (Tr. at 559-60.)  She acknowledged, however, that he occasionally cooked and would read a story to the children now and again.  (Tr. at 562.)

{¶ 7}    After she filed for divorce, she asserted that Greenfield stopped depositing his checks in the joint account and cut her off financially.  (Tr. at 578-79.)  She stated that this spurred her to move to Cleveland where her parents were located.  (Tr. at 691.)  However, she admitted that Greenfield sent her an e-mail when he closed the joint account in which he asserted that he would pay all household bills and give her spending money.  (Tr. at 758-63.)  She admitted that taking the children to Cleveland was a unilateral decision on her part, that Greenfield had asked for equal access to the children, and that she gave him only intermittent access to the children during the approximately two-month period that she

---

[1] We do not further discuss this witnesses' testimony as it is not relevant to the contested issues in this appeal.
[2] The trial transcript was filed in ten volumes on November 6, 2017.  Because the volumes are consecutively paginated we do not refer to volume number and simply cite the page.

was in Cleveland.  (Tr. at 767, 770-72.)  She denied that taking the children to Cleveland injured their relationship with their father and said it was normal for her and the children to spend summers in Cleveland.  (Tr. at 774-75.)  She denied that her father (the children's grandfather) moved in with her upon her return from Cleveland to the marital residence but admitted he stayed there four nights per week.  (Tr. at 849-51.)

{¶ 8}  During a February trial date, Ghani testified that she had recently accepted a job at a daycare in Reynoldsburg at $16 per hour for 40 hours per week (although she later revealed that she was not yet working full-time and would not be doing so until after the conclusion of the case).  (Tr. at 640-41, 794-95.)  She admitted that despite the fact that she was not designated as the custodial parent or residential parent, and despite the fact that Greenfield (who was the residential parent) lived in Hilliard, she completed substantial paperwork to enroll the children in the preschool and after school program in Reynoldsburg.  (Tr. at 931-32, 937-38.)  This process included signing an enrollment agreement that stated that she was the primary parent and allowing the two youngest children to complete a day at the facility.  (Tr. at 792-94, 931-32, 937-38.)  She acknowledged that her expectation was that Greenfield would have had to pay for the preschool but denied any potential logistical difficulty with having the kids in preschool in Reynoldsburg while Greenfield lived in Hilliard and the eldest, E.G., attended school in Hilliard.  (Tr. at 904-06, 911-14.)  Ghani also agreed that, during one of the days of trial, January 4, 2017, she left the children with a babysitter without informing Greenfield where they were or who the sitter was, only revealing that she had done so when the children were not ready to be picked up at the appointed time from Ghani's house.  (Tr. at 799-800.)

{¶ 9}  She acknowledged, despite her status as the noncustodial parent, she made medical appointments without informing or obtaining consent from Greenfield.  (Tr. at 819-24, 828-30.)  Most notably, on April 27, 2016, she admitted that she took her daughter, A.G., to Children's Hospital for a sexual assault exam.  (Tr. at 825-28.)  She admitted, according to the hospital records, she told the hospital there was a shared parenting arrangement and falsely reported that there was domestic violence between her and Greenfield.  (Tr. at 830-32.)  She admitted that, without Greenfield's knowledge or consent, she authorized an ano-genital exam and colposcopy for A.G. but denied that the sexual assault exam was invasive to the child.  (Tr. at 827, 884-87.)  She admitted that she never

told either Greenfield or the guardian ad litem for the children about the exam or the suspicions that led her to have the exam performed. (Tr. at 883-84.) If given the opportunity to reprise the situation, Ghani testified that she would "possibly" have reported it to the guardian ad litem and Greenfield. (Tr. at 887.)

{¶ 10} She acknowledged (and hearing transcript excerpts confirm) that she had previously agreed to provide Greenfield with eight hours of make-up parenting time as a consequence of having improperly denied him parenting time on Beggars Night, 2015. (Apr. 7, 2016 Hearing Tr. Excerpt, filed July 5, 2016; Tr. at 852-54.) She admitted that she had never fulfilled this agreement and had no intention of ever doing so. (Tr. at 852-54.) She admitted that the trial court had ordered her to make certain payments to Greenfield, to Capital One, and on student loans for which Greenfield had served as her co-signer. She admitted, despite the court orders, she had not made such payments. (Tr. at 656-60, 864-65, 872.)

{¶ 11} She testified Greenfield did not communicate with her but she also admitted he had sent her a considerable number of e-mails and copied the guardian ad litem in each instance. (Tr. at 737-38.) When asked, she struggled to provide an example of a time when Greenfield had withheld information from her. (Tr. at 738-45.) She clarified that Greenfield had not literally failed to communicate but that she found his e-mails to be combative, not timely, and omitting of information she would have liked to have received. (Tr. at 737-38, 747.)

{¶ 12} Both acquaintances of Ghani testified that they had seen her interact with the children on many occasions and considered her to be a good mother. (Tr. at 165-70, 604-05.) Neither of these witnesses expressed any concerns about Greenfield's parenting ability though both had interacted with him on a much more limited number of times. (Tr. at 170, 617-18.)

{¶ 13} Ghani's father testified that Ghani is a great parent who has no weaknesses as a parent. (Tr. at 226, 306.) In contrast, he testified he believed that Greenfield had no strengths as a parent, was an absentee father, and essentially did not know how to interact with his children and therefore avoided doing so. (Tr. at 188, 307.) Ghani's father confirmed that after Ghani returned to the marital residence, he stayed there with her on weekdays and his wife stayed on weekends. (Tr. at 217-18.) Despite his negative view of

Greenfield, he agreed there was never any violence or threats of violence between Ghani and Greenfield. (Tr. at 214-15.)

{¶ 14} Ghani's private investigator, Cerise Allen, also testified. Allen testified that Greenfield was often "popping up at [Ghani's] residence unwelcomed and was staying for periods of time and primarily only during her time with the children." (Tr. at 339-40.) However, the time period of the monitoring from which Allen drew her conclusions was August until the end of September 2015. (Tr. at 318, 491.) Her testimony showed no awareness that Ghani was not granted exclusive beneficial use of the marital home until November 2015. (Tr. at 315-528.) Allen also was under the false impression that the court had forbidden anyone other than Ghani and Greenfield from driving the marital cars and her conclusions about where Greenfield was and how he was spending his time were based on the supposition he was always driving the car she thought he was driving. (Tr. at 396-97.) Beyond mere investigation, Allen took the step of confronting Greenfield in what she described in a recording as "gangster style," accusing him in an aggressive manner of having sent harassing text messages to her, of having conducted an extramarital affair, and of having impregnated his current girlfriend. (Sealed Ex. A.10.) She testified at trial that this confrontation took place in front of Greenfield's children and that he threatened to hit her. (Tr. at 494-95.) However, the recording reflects only that she dared him to hit her, saying, "You put your hands on me it'll be the end of your life. Put your hands on me." (Sealed Ex. A.10.) Furthermore, though the recording captures statements by all persons present, including Greenfield, it does not reflect that he ever threatened to hit Allen. *Id.* Allen also interviewed the eldest child on three occasions at Ghani's behest without informing the guardian ad litem or the children's father, who, at the time of the interviews, had legal custody. (Tr. at 495-97.)

{¶ 15} Greenfield's girlfriend, Walaa Waeda, whom Ghani called as a witness, testified that she was not legally married to Greenfield at the time of trial but that they had committed themselves to each other in a religious marriage ceremony in March 2016. (Tr. at 234, 248-49.) She testified that she knew Greenfield and Ghani through the school that her daughters attended (where Ghani had been a teacher and where Greenfield was, at one time, the principal). (Tr. at 237-39.) She testified that she works at Nationwide Insurance and has two daughters. *Id.* She explained that she and Greenfield started talking about

getting together in August 2015 and that, as of the time of trial, they were living together. (Tr. at 242-44, 255-56.)  Waeda testified that all the children get along well and appear to like her.  (Tr. at 268.)  She also testified that Ghani appears to have a good relationship with her two children.  (Tr. at 272.)

{¶ 16} Eugene Greenfield confirmed that, as of the time of trial, he was living in Hilliard with Waeda, his three children, and her two daughters (at least when his children were not with Ghani and when Waeda's two daughters were not with her former husband). (Tr. at 28, 31-32.)  He confirmed that he met Waeda through serving as principal of the school attended by her daughters.  (Tr. at 35-36.)  He agreed that he and Waeda began a relationship in August 2015 and engaged in a religious wedding ceremony in March 2016. (Tr. at 37-39.)

{¶ 17} Greenfield testified that, as of the time of trial, he had one job paying approximately $80,000 per year and also received income from the parties' rental condominium (which had been purchased with funds borrowed against his retirement). (Tr. at 55, 71-76.)  He explained he would have liked for his kids to have gone to preschool but, with the costs of litigating the lengthy divorce, he could not afford it.  (Tr. at 104, 1245-47.)  He also testified that his ability to pay for such things was hampered by the fact that Ghani had never paid anything toward the various sums the court had ordered her to pay during the course of the litigation.  (Tr. at 1227-30, 1245-47.)  Consequently, during his parenting time, when the children were not with him and Waeda, he testified that they were either with his mother or his father and stepmother (who were providing free daycare).  (Tr. at 110-11, 1247.)

{¶ 18} He admitted to having had a very hectic work schedule while married but denied that he ever put his kids second to his volunteer and organization involvement.  (Tr. at 1292-95.)  He denied that it had ever been the regular routine for the kids and Ghani to spend summers in Cleveland.  (Tr. at 1331-35.)  He testified that she permitted him to see the kids for approximately 12 days from the beginning of June through her return to the marital residence in August based on her assertion that she was the primary parent.  (Tr. at 1337-39.)

{¶ 19} Greenfield maintained that he spent quality time with his children often and disputed the conclusion and methods of Ghani's investigator.  (Tr. at 1356-58.)  He also

added his parents, his sister, and Ghani drove the marital cars and may have been driving the car on some of the occasions the investigator concluded he was away from the children based on GPS car tracking. (Tr. at 1357-58.) He admitted that he often relied on his family to watch the children when he was at work but testified that when he came home at night, he spent 95 percent of his time with his children. (Tr. at 1358-59, 1364-65.)

{¶ 20} Greenfield repeated the assertion that Ghani played religious literature recitations loudly late at night and introduced video evidence substantiating the allegation. (Tr. at 1349-50, 1355; Sealed Ex. A.7) He testified that when, on September 22, 2015, he attempted to enter the eldest child's bedroom to pick up some clothes for him, Ghani repeatedly blocked his path, holding their youngest child in her arms, and accused him of domestic violence when he tried to pass by her. (Tr. at 1351-53.) This incident was also confirmed by video and audio evidence admitted at trial. (Sealed Ex. A.6.)

{¶ 21} Greenfield also confirmed that Ghani never informed him that she subjected A.G. to a sexual assault exam and only learned that she had done so when he received the information from Children's Hospital in connection with an unrelated request. (Tr. at 1369-70.) At that point, he notified the guardian ad litem who had also not heard about the sexual assault exam previously. *Id.* He said that Ghani communicated with him in a literal sense, sending him things such as kindergarten worksheets, but failed to consult him on major decisions. (Tr. at 1467-69.)

{¶ 22} Greenfield summarized his reason for seeking sole custody by pointing out that he had held sole legal custody from November 2015 until trial and yet Ghani had not obeyed court orders or respected his rights as the custodial parent. (Tr. at 1493.) He testified that granting shared parenting would only embolden her to make more decisions about the children without telling him. *Id.* He explained that he and Ghani cannot make decisions jointly because Ghani had consistently taken the view that "she was the decider for [the children] even after we came to this court." (Tr. at 1265-73.)

{¶ 23} Greenfield's sister testified that she sometimes watched the children in the past and enjoyed spending time with them. (Tr. at 1000-03.) She stated, based on her observations, Greenfield was very involved in his children's lives; helped them with homework, took them to religious study sessions, went on walks with them, and took them on outings such as the park, the library, and bowling. (Tr. at 996-98.) She testified the

interactions between Waeda and the children also seemed to be very positive.  (Tr. at 997-98.)

{¶ 24} Greenfield's father testified that he and his wife had often watched the children.  (Tr. at 1106-09.)  He confirmed that Ghani is a good mother and taught the children very well.  (Tr. at 1116.)  He testified that he had no hard feelings toward Ghani and would still be glad to help her with the children in any way that he could.  (Tr. at 1111.)  But he recounted that once the divorce was filed, she and her family turned very cold toward him, to the point where they will not even walk through a door if he holds it open for them.  (Tr. at 1112-13.)  He also said that Ghani would try to work the kids and herself into an emotional frenzy against Greenfield and his family at drop-offs by repetitively saying things to the children like, "Mommy knows you don't want to go.  Mommy is sorry. * * * I know you want to stay with Mommy."  (Tr. at 1130-33.)

{¶ 25} He confirmed that Ghani initially absconded to Cleveland with the children and did not willingly return with them or bring them back for regular visits until ordered to do so by the court.  (Tr. at 1109-10.)  He also confirmed that on January 4, 2017, during the course of trial, he and his wife went to Ghani's house to pick up the children at the appropriate time and found that no one was home.  (Tr. at 1124-27.)  After nearly one-half hour of waiting, Ghani and her parents drove up and handed him and his wife a slip of paper with an unknown address and told them to pick up the kids there.  *Id.*  So he and his wife drove 30 minutes to that address and picked the kids up from someone who was, to them, a total stranger, but who had, unbeknownst to any of them, been acting as a babysitter.  *Id.*

{¶ 26} Greenfield's father acknowledged there were times when his son had spread himself a bit thin but denied that it ever got to the point where he could not take proper care of his children.  (Tr. at 1117-18.)  He testified Greenfield had related he felt it necessary to take on additional jobs to maintain the standard of living for his family after Ghani quit her job to become a stay-at-home mom.  (Tr. at 1120-21.)  He related he warned Greenfield about burning himself out and noted Greenfield only had one job at the time of trial.  (Tr. at 1122-23.)  He said based on his observations, Waeda, Greenfield, and both his and her children formed a nice family unit and appeared to get on well.  (Tr. at 1115-16.)

{¶ 27} The guardian ad litem testified that the children did well in both Greenfield and Ghani's household and did not have a preference between them. (Tr. at 1515-16.) The guardian ad litem also testified that both parents were good with the children when the other parent was not around and other relatives on both sides were supportive and had good relationships with the children. (Tr. at 1516-17.) However, he testified that throughout the multi-year life of the divorce litigation, though the parties did communicate with each other, they had been unable to agree on anything and could not, as a result, effectively co-parent. (Tr. at 1509, 1517.) He, therefore, recommended that Greenfield remain the custodial and residential parent, that the parties have equal parenting time, and that each have the right of first refusal to watch the children if the other were to be out of town. (Tr. at 1517, 1525-26.)

{¶ 28} In explaining why Greenfield rather than Ghani should be the sole custodial and residential parent, the guardian ad litem explained he had concerns about Ghani's stability and respect for Greenfield's parental rights. (Tr. at 1519-20, 1527, 1588-89.) He noted compliance with court orders had been a problem for Ghani. (Tr. at 1521, 1527.) In particular, he considered it troubling Ghani had taken A.G. for a sexual assault exam without informing the custodial parent, Greenfield. (Tr. at 1513-14.) One reason he found this troubling was, if her suspicions were genuinely felt and actually true, by not informing Greenfield, she would have been depriving him of the ability to effectively protect the child from the person she allegedly suspected. (Tr. at 1513-14, 1544.) She then compounded this behavior by failing to mention it in deposition even when asked questions that should have elicited its disclosure. (Tr. at 1513-14.) He questioned Ghani's stability and testified she had proven herself to be totally unreasonable, unable to compromise or agree on even the most minor of issues, because she often dissolved into hysterics in situations which did not seem to call for it, and she perceived Greenfield's e-mails sounding in a neutral tone to be aggressive or insulting, with often evinced belief that her devices had been "hacked" and that listening devices had been planted in her surroundings, causing her to search for them. (Tr. at 1536-40, 1594.)

{¶ 29} In June 2017, the trial court issued a lengthy divorce decree. (June 8, 2017 Divorce Decree.) The decree set forth and contained considerations of each required factor listed in R.C. 3109.04(F)(1)(a) through (j), 3109.04(F)(2)(a) through (e), and

3109.051(D)(1) through (16). (Divorce Decree at 7-16.) After that analysis, the trial court named Greenfield the legal custodian and residential parent. *Id.* at 28. But even as legal custodian, the agreement required that he consult with and advise Ghani in advance of all significant decisions which affect the children and it empowered him to make final decisions on behalf of the children only when documented efforts to consult and advise failed to produce agreement from Ghani. *Id.*

{¶ 30} The trial court, in its decree, also ordered the marital residence to "be immediately listed for sale and sold to the first reasonable valid offer." *Id.* at 34. The trial court ordered Ghani to vacate the property and for Greenfield to continue paying the mortgage and other bills until the time of sale. *Id.* at 34-35. It then specified how the sale was to be conducted:

> [Greenfield] shall have the exclusive right to list, counter offer, and accept offer without agreement of [Ghani]. [Ghani] shall fully cooperate as necessary to effectuate a sale. * * * [Greenfield] shall keep [Ghani] advised of all progress on the sale and provide her with copies of all offers, counter offers, contracts. [Ghani] shall fully cooperate with timely closing on the real estate.
>
> At the time of sale, if she has not already done so, [Ghani] shall pay to [Greenfield] from her share of the net proceeds the sum of $6,174.91 (for Orders herein relative to findings above and any documented minimum payments made to Capital One through the effective date of this Order) **plus** $1,200 to equalize the property division herein.

*Id.* The trial court also ordered Ghani to sell the parties' Nissan and Lincoln no later than 30 days after the sale of the marital residence and made Greenfield responsible for payments in relation to the vehicles until one day after the closing on the marital residence. *Id.* at 36. The decree finally specified:

> Unless otherwise indicated herein, this Decree is subject to Civil Rule 70 compliance. Each party shall transfer any, and interest to any, property in his or her possession, title, or name, to the other party within 15 days of this Order.

*Id.* at 38.

{¶ 31} On July 6, 2017, Ghani filed a timely notice of appeal. (July 6, 2017 Notice of Appeal.)

{¶ 32} On July 11, 2017, Greenfield filed a motion to enforce the decree alleging that Ghani had not signed a quit-claim deed to the marital property within 15 days in order to permit him to sell the residence as directed in the decree. (July 11, 2017 Greenfield Mot. to Enforce.) Ghani responded that she would not cooperate in the sale without enforceable assurances that Greenfield would not attempt to withhold money or do anything other than give Ghani one-half of the money for the sale of the house. (Aug. 9, 2017 Memo. in Opp. at 3.) Shortly thereafter, Ghani also filed a motion to enforce the decree, asking the court to require Greenfield to keep her up-to-date on the progress of the sale, to pay her one-half the sale price of the home "without deductions" and to turn over funds received from an insurance company since, post-decree, the Lincoln apparently suffered damage resulting in a total loss. (Aug. 14, 2017 Ghani Mot. to Enforce at 1.)

{¶ 33} The following day, August 15, 2017, the trial court held a hearing on the motions. (Aug. 15, 2017 Hearing Tr., filed Nov. 8, 2017.) At the hearing, the court clarified that Ghani was not required to execute a quit-claim deed if she attended the closing and cooperated in signing all necessary documents as she was ordered to do. *Id.* at 3-6. The court further clarified that amounts ordered in the divorce decree were to be deducted from the parties' share of the proceeds and that all such payouts should be noted on a settlement sheet provided to both Greenfield and Ghani. *Id.* at 16-18. It, therefore, held the matter in abeyance until after closing. *Id.* at 17-18.

{¶ 34} On October 26, 2017, Ghani filed a motion to enforce the decree alleging no deductions were to be made from her half of the marital residence sale, Greenfield was not empowered to place with a title company the responsibility of dividing funds, and the title company had included several proposed deductions that were not even plausibly authorized by the decree. (Oct. 26, 2017 Ghani Mot. to Enforce at 2-3.) Greenfield filed a motion to enforce on October 30, 2017, noting Ghani had refused to attend the closing three days earlier (on October 27) and requesting she be sentenced to ten days in jail since she had also failed to pay sums previously ordered. (Oct. 30, 2017 Greenfield Mot. to Enforce.)

{¶ 35} On November 8, the trial court held a hearing on these motions. (Nov. 8, 2017 Hearing Tr., filed Nov. 30, 2017.) At the hearing, both Greenfield and Ghani testified. Ghani admitted she had notice of the closing but did not attend or sign papers to effectuate the closing. *Id.* at 39. She further stated she was not willing to sign the documents as they

were presently constituted.  *Id.* at 45-47.  She also stipulated she had not paid her student loans (upon which Greenfield was a co-signer) and also had paid none of the amounts ordered by the trial court.  *Id.* at 38, 40.  Greenfield testified he did not give direction to the title company in how to prepare the closing documents or what to deduct.  *Id.* at 15-16.  He stated that closing for which Ghani failed to appear was on October 27 but that they had been able to negotiate a new closing date for November 9.  *Id.* at 19-20.  He confirmed Ghani had made no payments and even the ring returned to him in stated compliance with the decree was fake.  *Id.* at 30-31.

{¶ 36} Following the hearing, the trial court issued an entry that provided, in relevant part, as follows:

> Pursuant to the terms of the Judgment Entry Decree of Divorce this Court made specific orders for the sale of [the marital home.]  Specifically, "[Greenfield] shall have the exclusive right to list, counter offer, and accept offer without agreement of [Ghani].  [Ghani] shall fully cooperate as necessary to effectuate a sale."  [Ghani] was notified of a closing date on or about October 18, 2017.  The closing was scheduled for October 27.  [Ghani] failed to appear and/or to cooperate to effectuate the sale.  [Greenfield] has been able to renegotiate a new closing date of November 9, 2017.
>
> Based on the testimony and evidence presented it is evident that [Ghani] will not cooperate to effectuate this sale.  Furthermore, [Ghani's] actions in this matter indicate that she is not likely to effectuate the intent of the Decree of Divorce which was for the parties to be credited/debited for each of their respect[ive] obligations under the Decree so as to disentangle these parties.  To date, [Ghani] has failed to comply with any terms of the Decree of Divorce.  Her actions are consistent with her actions pre-Decree.

(Nov. 8, 2017 Entry at 1-2.)  Based on these findings, the court conferred authority upon Greenfield to sign all necessary documents on behalf of both parties to effectuate the closing and ordered adjustments made to the closing payouts of both parties as set forth in exhibits to the entry.  *Id.* at 2-3.  It also required Ghani make payments due for the Nissan after October 27, 2017 since her failure to cooperate in closing delayed the sale of the vehicle.  *Id.* at 3.  Finally, it awarded Greenfield attorney fees of $2,500 for having to file the motion.  *Id.* at 2.

{¶ 37} On November 20, 2017, Ghani sought to amend her notice of appeal to appeal this entry also. (Nov. 20, 2017 Am. Notice.) We granted leave to appeal on November 28, 2017. (Nov. 28, 2017 Entry.)

## II. ASSIGNMENTS OF ERROR

{¶ 38} Ghani assigns three errors for our review:

> [1.] THE TRIAL COURT ABUSED ITS DISCRETION IN NAMING APPELLEE LEGAL CUSTODIAN AND RESIDENTIAL PARENT AND IN GIVING HIM EQUAL PARENTING TIME.
>
> [2.] THE TRIAL COURT ERRED IN FINDING MS. GHANI IN CONTEMPT FOR VIOLATING A TERM OF THE DECREE AND IN AWARDING ATTORNEY FEES TO DEFENDANT.
>
> [3.] THE TRIAL COURT LACKED JURISDICTION TO ALTER THE TERMS OF THE DIVORCE DECREE WHILE AN APPEAL WAS PENDING.

## III. DISCUSSION

### A. First Assignment of Error – Whether the Trial Court Abused its Discretion Granting Greenfield Equal Parenting Time and Designating him Legal Custodian and Residential Parent

{¶ 39} Statutes in Ohio provide that when allocating parental rights and deciding parenting time, a court "shall consider" all relevant factors. *See* R.C. 3109.04(F)(1) and (2); R.C. 3109.051(D); *see also, e.g., Pater v. Pater*, 63 Ohio St.3d 393, 396 (1992) (noting that consideration of the factors is a mandatory statutory requirement). The statutes then list many specific factors that must be considered. *See* R.C. 3109.04(F)(1)(a) through (j); R.C. 3109.04(F)(2)(a) through (e); R.C. 3109.051(D)(1) through (16). In this case, the trial court's order proceeded factor-by-factor and neither party suggests that the trial court committed an error of law by omitting any factor. (Divorce Decree at 7-16.) This then moves the question to whether the trial court, despite having considered the factors it was required to consider, erred in weighing the evidence and reaching a conclusion. The Supreme Court of Ohio has held that we are to review that question for abuse of discretion:

> "The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. The knowledge a trial court gains through observing the witnesses and the parties in

> a custody proceeding cannot be conveyed to a reviewing court by a printed record."

*Pater* at 396, quoting *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988).

{¶ 40} Ghani asserts eight arguments as to how the trial court abused its discretion. First, she claims the trial court found both parties were irrationally emotional and stubborn in the course of the case, and, as such, it erred in making Greenfield legal custodian based on the guardian ad litem's testimony that Greenfield had been the more "reasonable" one. (Ghani's Brief at 4-7.) However, the fact both parties may have behaved badly during the course of the case does not prevent the court from finding one party was more reasonable than the other. The trial court had before it the testimony of the guardian ad litem based on his personal observations of the parties over the long life of this case; the trial court acted within its discretion to find the more reasonable of the feuding parents was Greenfield. Our own review of the evidence suggests the same conclusion and certainly reveals no abuse of discretion. *See supra* at ¶ 6-28.

{¶ 41} Ghani next claims the trial court failed to appropriately consider that she had always been the primary caregiver of the children, that Greenfield had been an absentee father, and that the trial court erred in not giving this factor enough weight. (Ghani's Brief at 7-21.) Our review of the evidence shows that Ghani and her father described the parenting relationship of the couple in that manner. *See supra* at ¶ 6, 13. However, Greenfield, his sister, and his father, all disputed that view in their testimony. *See supra* at ¶ 18-19, 23, 26. The investigator hired by Ghani misapprehended basic facts about the posture of the case (such as whether Greenfield was entitled to be present at the marital residence during her investigation and whether persons other than Greenfield were entitled to drive the parties' vehicles). *See supra* at ¶ 14. Consequently, the trial court did not abuse its discretion in finding her testimony less credible about Greenfield's parenting and involvement in the children's' lives. Ghani's other two witnesses testified favorably about her parenting skills, but had relatively little experience observing Greenfield with his children. *See supra* at ¶ 12. In short, while there was evidence to support Ghani's view of Greenfield's parenting, there was also evidence supporting a different view and neither set of evidence was overwhelming. The trial court was in a better position than we are to make a decision about which set of witnesses accurately described the family dynamic and we find no abuse of discretion in the fact that it did so.

{¶ 42} Ghani also argues the trial court placed improper emphasis on her relocation with the children to Cleveland at the outset of the case. (Ghani's Brief at 21-31.) She summarized her argument in this regard in four points: first, she "gave Greenfield visitation during [the time she was in Cleveland] although it was not ordered"; second, it "was not unusual for the children to spend summers in Cleveland"; third, she "had no independent means of support"; and fourth, the "relocation was justified" by the deteriorating relationship between the parties. *Id.* at 31. Her argument that she "gave Greenfield visitation" even though it was not "ordered" misapprehends the parties' status during the course of this case. Before any orders were filed in the case, Greenfield had the same rights as a parent as she did. Visitation did not need to be ordered for him to see his children. She deprived him of that when she unilaterally relocated with the children to Cleveland. (July 15, 2015 Ghani Aff. at 3.) It was certainly appropriate for the trial court to have been concerned by her choice to unilaterally leave the jurisdiction with the children mere days after filing for divorce. Ghani's arguments the children routinely spent summers in Cleveland and she had no independent financial means are supported by her testimony but are contradicted by Greenfield's testimony. *Compare* Tr. at 774-75 *with* Tr. at 1331-35. The trial court's determination of credibility on these matters is entitled to deference and we find no abuse of discretion. Finally, Ghani's assertion that the out-of-jurisdiction relocation was justified by the deteriorating relationship between the parties is not supported by any evidence in the record. There is no evidence in the record that Greenfield, a school principal, was a danger to her or their children to cause her to flee the jurisdiction. Even Ghani's father, whose testimony was otherwise extremely critical of Greenfield, conceded there were neither acts nor threats of violence during the relationship. (Tr. at 214-15.)

{¶ 43} Ghani next argues the trial court abused its discretion in finding that she had violated court orders by scheduling doctor's appointments and attempting to enroll the children in preschool. (Ghani's Brief at 31-38.) This argument has two prongs. First Ghani argues the temporary order, though it named Greenfield residential parent and gave him legal custody of the children, did not specifically prohibit her from scheduling appointments and making medical decisions unilaterally for the children. *Id.* at 33-36. Second, she argues the evidence shows Ghani did not actually attempt to enroll the children

without Greenfield's consent because she listed him as a contact on the enrollment paperwork and sent him an e-mail in connection with the process. *Id.* at 36-38.

{¶ 44} "Legal custody" is defined in the Ohio Revised Code as:

> "Legal custody" means a legal status that vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the **right and duty to** protect, train, and discipline the child and to **provide the child with** food, shelter, **education**, and **medical care**, all subject to any residual parental rights, privileges, and responsibilities.

(Emphasis added.) R.C. 2151.011(B)(21); *see also* R.C. 3109.51(D) (" 'Legal custody' and 'residual parental rights, privileges, and responsibilities' have the same meanings as in section 2151.011 of the Revised Code."). "Residual parental rights, privileges, and responsibilities" is defined in the Ohio Revised Code as, "those rights, privileges, and responsibilities remaining with the natural parent after the transfer of legal custody of the child, including, but not necessarily limited to, the privilege of reasonable visitation, consent to adoption, the privilege to determine the child's religious affiliation, and the responsibility for support." R.C. 2151.011(B)(48). By law, Greenfield, not Ghani, was the party with the "right and duty to * * * provide the child[ren] with * * * medical care." R.C. 2151.011(B)(21). Regardless of Ghani's "understanding" of the trial court orders, that is what the orders meant and she violated them when she repeatedly and without consulting Greenfield scheduled and obtained medical care for the children.

{¶ 45} Ghani's claim now that she did not attempt to enroll the children in preschool without Greenfield's consent is contradicted by her own testimony at trial. The e-mail she in her brief claims she sent to Greenfield inquiring about preschool was actually not in relation to the preschool in Reynoldsburg in which she attempted to enroll the children. (Tr. at 645-46.) With respect to the Reynoldsburg preschool, she admitted at trial she listed herself as the primary parent on the enrollment agreement and, without first informing Greenfield, she had the children spend a day at the facility. (Tr. at 792-94, 931-32, 937-38.) The trial court did not abuse its discretion in finding she attempted to enroll the children in preschool without first obtaining Greenfield's consent.

{¶ 46} Ghani, in her brief, argues Greenfield made unilateral decisions without informing her and this shows that he should not have been given legal custody. (Ghani's

Brief at 39-46.) Ghani, in her brief, cites to several instances in her own testimony where she claimed Greenfield made decisions for the children without involving her. *Id.* However, when reminded that Greenfield copied the guardian ad litem in the many e-mails he sent informing Ghani of developments with the children, she admitted her complaints about his communication were not actually that he completely failed to communicate and were more about the timeliness of communication and the attitude in which things were presented to her. (Tr. at 737-38, 747.) Her arguments in this regard fail to take into account that Greenfield was the legal custodial parent and residential parent. (Nov. 3, 2015 Order at 2.) Thus, he did comply with the court's order of prior consultation and notice, and he was entitled by court order to make decisions on behalf of the children in relation to "food, shelter, **education**, and **medical care**." (Emphasis added.) R.C. 2151.011(B)(21).

{¶ 47} Ghani also argues Greenfield acted selfishly in moving to Hilliard, far from the marital residence. (Ghani's Brief at 40.) But it was on her motion he was ejected from the marital residence in the first instance. (Aug. 7, 2015 Mot. for Beneficial Use.) Ghani urges that we find Greenfield acted unreasonably in insisting on strict compliance with court orders regarding school pick up times rather than cutting short his parenting time for her convenience, that he only gave her copies of the eldest child's homework in a disorganized fashion, and that he acted sub-optimally toward her in a number of other minor ways. (Ghani's Brief at 39-42.) Ghani's many incidental complaints about Greenfield are not without basis in evidence. But the record shows these parties were practically incapable of cooperating with one another. Shared parenting was not a realistic option, leaving the trial court with a difficult choice in naming a legal custodian. It chose to err on the side of the party who the record shows had acted more reasonably, more respectful of the other parent's rights, and more often in accord with court orders. We can find no abuse of discretion in the trial court's naming Greenfield legal custodian of the parties' children.

{¶ 48} Ghani, in her brief, finally argues the trial court ignored evidence of hacking and it used the testimony about it as evidence of Ghani's paranoia and instability. (Ghani's Brief at 46-51.) The record contains testimonial evidence from Ghani, her investigator, a friend of Ghani's and others connected with the case that they were receiving harassing text messages, including some that suggested phone security had been bypassed. (Tr. at 356-

57, 505-07, 605-07.)  Ghani in her brief also attaches great significance to Allen's testimony, after she confronted Greenfield, no further hacking or text message incidents occurred. (Ghani's Brief at 47-48.)  However, no physical evidence of such text messages or hacking was preserved or presented in the record.  No subscriber details were ever obtained or IP traces conducted to determine the identities of those responsible.  No information about any law enforcement investigation was introduced, nor does there appear to have been any such an investigation.  *Id.* at 504.  And Greenfield denied being involved in hacking of any kind.  (Tr. at 1366-67.)  As the factfinder in the best position to weigh the evidence, the trial court apparently found the allegations of hacking not to be credible or, at least, not credibly tied to Greenfield, and, therefore, did not credit them in its decision.  There was no abuse of discretion in this regard.

{¶ 49}  To the extent that Ghani, in her brief, may be understood to argue Greenfield and Ghani should not have been given equal parenting time, we note there is no substantial evidence that either party is anything other than a good parent when not consumed by conflict with the other parent.  Consequently, we see no abuse of discretion in the trial court's decision to divide parenting time equally between the two parents.

{¶ 50}  We overrule Ghani's first assignment of error.

### B. Second Assignment of Error – Whether the Trial Court Erred in Holding that Ghani had Violated the Decree and in Ordering Her to Pay Attorney's Fees and Costs

{¶ 51}  Ghani argues the divorce decree entitled her to one-half of the proceeds of the sale of the marital residence and the title company could not make any deductions from her share.  (Ghani's Brief at 52-53.)  Rather, she argues, the title company should have issued her a check for one-half of the proceeds, whereupon she would have then gone to the bank and paid Greenfield what she determined that she owed him.  *Id.*  Because of this alleged misunderstanding and also because there were specific errors in the title company's proposed distribution of payments, Ghani asserts she was justified in not attending the closing and in refusing to cooperate in signing documents.  *Id.* at 51-57.  Since her refusal to attend and cooperate was allegedly justified, she concludes that the trial court erred when it ordered her to pay $2,500 in attorney fees to Greenfield as well as car and house payments which were extended as a result of the delay in closing due to her no show at the closing.  *Id.*

{¶ 52} The divorce decree ordered the marital residence to be sold and specified:

> **At the time of sale**, if she has not already done so, [Ghani] shall pay to [Greenfield] from her share of the net proceeds the sum of $6,174.91 (for Orders herein relative to findings above and any documented minimum payments made to Capital One through the effective date of this Order) **plus** $1,200 to equalize the property division herein.

(Emphasis sic and added.) (Divorce Decree at 35.) In other words, the divorce decree required Ghani to pay certain sums. If she failed to pay them before closing, she had to pay them, "**[a]t** the time of the sale." (Emphasis added.) *Id.* If she took her money to the bank, waited for the money to clear, and then wrote Greenfield a check (as she in her brief argues she was entitled to do) that would not be **at** the time of the sale, but rather *after* the time of the sale.

{¶ 53} Not only did the decree clearly specify any amounts not paid prior to sale would be required to be paid **at** the time of the sale, the trial court itself orally explained the matter to Ghani and her counsel. That is, Ghani filed a motion to enforce the decree, asking the court to require Greenfield to, among other things, pay her one-half of the sale price "<u>without deductions</u>." (Emphasis sic.) (Ghani Mot. to Enforce at 1.) On August 15, 2017, over one month before the October 27 closing, the trial court held a hearing and made clear the title company would effectuate the decree through deductions following the settlement sheet. (Aug. 15, 2017 Hearing Tr. at 17-18.) The trial court said:

> THE COURT: Get the information. Tell them that you're going to need a settlement sheet in advance. Give them a copy of the decree. Closing companies deal with this all the time. It's very specific.
>
> It says -- Let me ask you this question, [Plaintiff's Counsel]: Has your client paid to Mr. Greenfield $6,174.91?
>
> [PLAINTIFF COUNSEL]: No.
>
> THE COURT: Has she paid the $1200 to equalize the property division?
>
> [PLAINTIFF COUNSEL]: No.
>
> THE COURT: All right. Then those are very specifically, after the settlement sheet, simple math, divide by two, subtract from

> your side so that it gets paid to him right then and there. It's
> not about when you do that later.

*Id.* For Ghani to argue even now on appeal, that the title company should have paid her one-half the marital home's sale price, free and clear of all deductions, and then allowed her to go to the bank and pay Greenfield whatever she determined she would pay him, is without merit.

{¶ 54} Ghani has also argued there were a number of items on the distribution sheets that were incorrect and this justified her decision to absent herself from the closing. But Ghani was not ordered to simply sign whatever documents the title company prepared. She was ordered to "**fully cooperate <u>as necessary</u> to effectuate a sale**." (Emphasis added.) (Divorce Decree at 34.) She was not in a position to boycott the closing and not appear. Full cooperation means at the very least, participation. One who is ordered to fully cooperate in a real estate closing is not prevented from calling attention to errors in the documents while at the closing.[3] But that generally requires the individual or her agent with authority to act showing up to the closing, pointing out errors in the title company's documents, cooperating in on-the-spot alterations, and signing the corrected documents. There was no basis for Ghani to boycott the closing entirely at the last minute.

{¶ 55} The sanction of attorney fees was appropriate as was the assessment of costs related to her actions to delay the October 27, 2017 closing. Ghani's second assignment of error is overruled.

## C. Third Assignment of Error — Whether the Trial Court Impermissibly Modified its Decree by Issuing an Order to Enforce while an Appeal was Pending

{¶ 56} Ghani argues that the lower court acted without jurisdiction when, after an appeal from the divorce decree was already pending, it issued its entry enforcing the decree and punishing Ghani's failure to comply with the decree. (Ghani's Brief at 58-59.) We have previously stated:

---

[3] We note that the errors Ghani alleged were that credit card payments totaling $617 were improper and that the total purchase price was erroneously listed as $189,900 rather than $192,400. (Nov. 8, 2017 Hearing Ex. C; Nov. 8, 2017 Entry Exs. B-C.) But although the purchase price was listed incorrectly, the one-half purchase price (from which the distribution to each party was calculated), was correctly listed as $96,200 (which is one-half of $192,400). *Id.* And while $617 was apparently an incorrect deduction and is a meaningful sum, it is not a substantial sum in comparison to the total value of the transaction, nor the money spent litigating the issue. *Id.*

> As a general rule, the filing of a notice of appeal divests the trial court of jurisdiction over those aspects of the case on appeal. *Howard v. Catholic Social Servs. of Cuyahoga Cty., Inc.*, 70 Ohio St.3d 141, 1994 Ohio 219, 637 N.E.2d 890 (1994). "[T]he trial court retains all jurisdiction not inconsistent with the reviewing court's jurisdiction to reverse, modify, or affirm the judgment." *Id.* at 146. This retained jurisdiction includes the authority to rule on collateral issues such as contempt, appointment of a receiver, and injunction. *State ex rel. Special Prosecutors v. Judges Court of Common Pleas*, 55 Ohio St.2d 94, 97, 378 N.E.2d 162 (1978). In the context of domestic relations, Civ.R. 75 expressly permits a trial court to modify certain provisions in a divorce decree pending appeal.

*Young v. Young*, 10th Dist. No. 13AP-95, 2013-Ohio-4933, ¶ 9. When a court retains jurisdiction it also retains the power needed to cause its prior judgment to be executed or enforced. *State ex rel. Klein v. Chorpening*, 6 Ohio St.3d 3, 4 (1983).

{¶ 57} Notwithstanding this caselaw, Ghani asserts that, in three respects, the trial court's enforcement entry went beyond mere enforcement and modified the terms of the decree. (Ghani's Brief at 58-59.) She argues, in requiring her to pay a mortgage payment on the marital home, in requiring her to pay for the car after October 27, 2017, and in ordering her to pay on the Capital One credit card until the date of sale of the parties' condominium, the trial court impermissibly altered the terms of the decree without jurisdiction to do so. *Id.* In one respect, we agree.

{¶ 58} The divorce decree ordered Greenfield to pay for the mortgage, taxes, and insurance on the marital property until the time of the sale. (June 8, 2017 Divorce Decree at 35.) Thus, the effect of the decree, if not for Ghani's boycott of the closing, would have been for Greenfield to cease paying on October 27, 2017 (the date of closing). Because of Ghani's no show at the closing, the trial court ordered Ghani to pay a single mortgage payment rather than ordering her to begin paying all expenses on the marital residence after October 27, 2017 until the date of the sale. (Nov. 8, 2017 Entry Exs. B-C.) We find this to have been a reasonable action to enforce the original meaning and intent of its decree in light of Ghani's failure to cooperate.

{¶ 59} The decree ordered Greenfield to pay the note and insurance on the parties' Nissan until one day after the sale date of the marital residence. (Divorce Decree at 36.) The effect of the decree, but for Ghani's boycott of the closing, would have been for

Greenfield to cease paying one day after October 27, 2017. The trial court in its November 8, 2017 entry ordered Ghani to begin paying for the Nissan immediately after October 27, 2017. (Nov. 8, 2017 Entry at 3.) By ordering Ghani to begin paying immediately after October 27, 2017, the trial court placed Greenfield in essentially the same position he would have been had Ghani not obstructed the October 27, 2017 closing. As such it acted reasonably to enforce the original intent of the decree.

{¶ 60} Finally, the decree ordered Ghani to pay $2,308 for minimum payments made on the Capital One credit card from August 2015 through January 2017 plus any documented minimum payments from that date "through the effective date of this Order." (Divorce Decree at 25.) In other words, it required Ghani to pay $2,308 plus whatever amount Greenfield could document having paid as minimum payments from January through June 8, 2017. *Id.* The decree provided for recovery of such payments from the proceeds of the sale of the marital residence and the parties' condominium. *Id.* at 35. However, the trial court in its November 8, 2017 enforcement entry required Ghani to reimburse Greenfield's payments made on the Capital One card "after January 2017 * * * until closing on [the parties' rental condominium]." (Nov. 8, 2017 Entry at 2.) That improves Greenfield's position beyond the scope of the original decree and constitutes an improper modification of the decree. The trial court was not acting within its retained jurisdiction to merely enforce the decree when it assigned the Capital One card liability to Ghani to an extent not contemplated in the original decree or necessitated to effectuate the intent of the original decree in light of Ghani's failure to cooperate.

{¶ 61} We, therefore, sustain in part and overrule in part Ghani's third assignment of error.

## IV. CONCLUSION

{¶ 62} Because throughout the life of this case the parties could not cooperate with one another, the trial court had little choice but to name one or the other of them the legal custodian and residential parent for their three children. The trial court's decision that Greenfield was the more reasonable of the two feuding parties was supported by the evidence in the record. Thus, we find no abuse of discretion in the trial court's decision to name Greenfield the legal custodian and residential parent. Nor do we find an abuse of discretion in the equal division of parenting time.

{¶ 63} The trial court retained jurisdiction to enforce its decree and did not err in doing so except insofar as its enforcement technically and impermissibly modified the decree with respect to the Capital One card payments.

{¶ 64} We overrule Ghani's first and second assignments of error. We sustain in part and overrule in part her third assignment of error. The divorce decree of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, is affirmed in full. The enforcement judgment is affirmed in part, reversed in part and remanded.

*Divorce decree judgment affirmed.*
*Enforcement judgment affirmed in part,*
*reversed in part, and remanded.*

DORRIAN and HORTON, JJ., concur.

———————————